# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3543

_____

United States of America

*Plaintiff - Appellee*

v.

Joey Matthew Loesel

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: June 12, 2013
Filed: August 26, 2013

_____

Before COLLOTON, GRUENDER, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Joey Matthew Loesel pled guilty to conspiring to manufacture and distribute at least 50 grams of actual methamphetamine and 500 grams of a meth mixture or substance — in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A). The district

court[1] sentenced him to 180 months' imprisonment. He appeals, attacking a sentencing enhancement, his girlfriend's pseudoephedrine purchases attributed to him, and the evidence used to determine the guideline range. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Almost daily from 2005 to 2011, Loesel and his girlfriend used meth or tried to get it. They purchased pseudoephedrine (a drug used to make meth) from pharmacies, and delivered it to meth "cooks." Loesel assisted with meth production on a farm, in residential areas, and in a moving vehicle. A warranted search of the farm uncovered "a very large methamphetamine cooking site," with three active meth labs. Chemicals, substances, and equipment for manufacturing meth were strewn "throughout the entire property." Corroding tanks stored anhydrous ammonia. Collectively, ten locations on the farm had over 10 grams of pure meth, and 3,100 grams of meth mixtures used in the lithium-ammonia-reduction method. There were enough pseudoephedrine pills and empty packs to produce over 164 grams of pure meth.

Loesel entered a proffer agreement. The government could use information in it "to rebut any factual position taken by or on his behalf in connection with sentencing issues or for any other reason." At sentencing, he challenged an enhancement for causing substantial risk of harm to human life or the environment. He disputed attributing to him his girlfriend's pseudoephedrine purchases. He objected to the government introducing information from his proffer to support the drug quantity. The district court used the information, attributed the purchases to him, and imposed the enhancement.

---

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

II.

Loesel believes he did not create a substantial risk of harm to human life or the environment under U.S.S.G. § 2D1.1(b)(13)(C)(ii), because of the meth farm's "rural location." This court reviews de novo "the application of the substantial risk of harm standard to the undisputed facts." *United States v. Pinnow*, 469 F.3d 1153, 1156 (8th Cir. 2006) (citations omitted). Factors to consider include: (1) the quantity of chemicals at the lab, and how they were stored; (2) how any "hazardous or toxic substances were disposed," and their likely release into the environment; (3) the duration and extent of manufacturing; and (4) the lab's location, and the number of human lives placed at substantial risk of harm. **U.S.S.G. § 2D1.1 cmt. n.20(A)** (now **cmt. n.18(B)**); *see United States v. Wells*, 706 F.3d 908, 917 (8th Cir. 2013). Though courts must consider these factors, they can "take into account the dangers inherent in methamphetamine manufacturing." *Pinnow*, 469 F.3d at 1157.

Here, the factors favor enhancement. Under the first and second factors, the search revealed over 10 grams of pure meth, 3,100 grams of meth mixtures, and evidence of enough pseudoephedrine to produce over 164 grams of pure meth. *See United States v. Whited*, 473 F.3d 296, 299-300 (6th Cir. 2007) (applying the enhancement for 1.23 grams of pure meth). The meth farm had three active meth labs. Numerous substances and chemicals – some in corroding tanks – and equipment used to produce meth were found throughout the entire property. These substances and chemicals are toxic and "can cause explosions and fires." *Pinnow*, 469 F.3d at 1156 (citation omitted).

As to the third and fourth factors, for years, in several locations, Loesel helped manufacture meth using the lithium-ammonia-reduction method. "The many risks to human life and to the environment from this method of manufacture are well known." *Id.* at 1157, *citing United States v. Chamness*, 435 F.3d 724, 727 (7th Cir. 2006), *and United States v. Allen*, 297 F.3d 790, 796 (8th Cir. 2002). It produces "toxic and

-3-

often lethal waste." *Id.* at 1156 (citation omitted). Though the farm was remote, Loesel, his co-conspirators, the farm owner, and the officers who searched the farm were exposed to the meth labs. Even if the conspirators and owner "assumed the risk," as Loesel asserts, they were nonetheless "human lives placed at substantial risk of harm." *See* **U.S.S.G. § 2D1.1 cmt. n.20(A)**; *cf. United States v. Davidson*, 409 F.3d 304, 314 (6th Cir. 2005) (not applying the enhancement where the defendants tried once to make meth in a remote, locked barn, and the operation did not: involve "an unusually large quantity of hazardous materials"; exist "for an unusually long period of time"; or "actually result[] in the disposal of the materials in a way harmful to human life or the environment"). Also, manufacturing occurred in residential areas and in a moving vehicle, placing additional lives at substantial risk. Considering the scope of meth activity, the district court did not err in applying the enhancement. *See Pinnow*, 469 F.3d at 1157 (holding the offense created a substantial risk of harm where the defendant, "staying in various hotels," possessed "a substantial quantity of pseudoephedrine, enough to manufacture fifty grams of pure meth[], plus other chemicals and equipment used in the lithium ammoni[a] reduction method").

III.

Loesel claims the district court should not have attributed to him his girlfriend's pseudoephedrine purchases, because they were not reasonably foreseeable to him. "The district court's drug quantity . . . determinations are factual findings . . . review[ed] for clear error, applying the preponderance-of-the-evidence standard." *United States v. Walker*, 688 F.3d 416, 420 (8th Cir. 2012). "Only if this court has a definite and firm conviction that a mistake has been made, will it reverse the sentencing court's factual findings." *United States v. Two Elk*, 536 F.3d 890, 909 (8th Cir. 2008).

"When calculating drug quantity in . . . a narcotics trafficking conspiracy, the sentencing court may consider all transactions[,] known or reasonably foreseeable to

-4-

the defendant," that furthered the conspiracy. ***United States v. Payton***, 636 F.3d 1027, 1046 (8th Cir. 2011). A co-conspirator's testimony "may be sufficiently reliable evidence" for the court to "base its drug quantity calculation for sentencing purposes." ***Id.*** "Drug quantities purchased for personal use by a member of the conspiracy are relevant in determining the total drug quantity attributable to the defendant." ***Walker***, 688 F.3d at 422. The "sentencing court should consider the similarity, regularity, and temporal proximity of the conduct in determining whether it is part of the same course of conduct or common scheme or plan." ***Payton***, 636 F.3d at 1046-47.

According to Loesel's girlfriend, they used meth, or worked together to get it, almost daily for years. This included buying pseudoephedrine from pharmacies, and distributing it to meth manufacturers. Loesel contends that some of her purchases were "secretive," and she never "accepted her role exclusively within a larger unit." He relies on *United States v. Palafox-Mazon*, 198 F.3d 1182 (9th Cir. 2000). There, each defendant was responsible only for his personal drug quantity, with "no evidence suggesting that the Defendants accepted their 'role within a larger unit.'" ***Palafox-Mazon***, 198 F.3d at 1190-91. But unlike Loesel, the defendants there neither pled guilty to conspiracy, nor undertook "joint criminal activity." ***Id.*** at 1185, 1187, 1191. Given Loesel and his girlfriend's extensive joint meth use and pseudoephedrine distribution, it was reasonably foreseeable to him that – even in his absence – his girlfriend would purchase pseudoephedrine from pharmacies. Her testimony shows she accepted a role in the conspiracy. "In light of this ongoing arrangement," the district court did not clearly err in attributing to him his girlfriend's pseudoephedrine purchases. *See **United States v. Voegtlin***, 437 F.3d 741, 748 (8th Cir. 2006) (attributing to the defendant a pseudoephedrine purchase by a co-conspirator, though the defendant did not direct her to make it, because she "routinely obtained pills for [him]").

IV.

Loesel argues the district court used information in the proffer agreement to determine the guideline range, violating U.S.S.G. § 1B1.8(a). This court reviews "the district court's factual findings for clear error, and its interpretation and application of the guidelines[] de novo." *United States v. Robinson*, 639 F.3d 489, 495 (8th Cir. 2011); *see United States v. Perry*, 640 F.3d 805, 810 (8th Cir. 2011).

If the government agrees that self-incriminating information in a proffer cannot be used against the defendant to determine the guideline range, the sentencing court may use such information only "to the extent provided in the agreement." **U.S.S.G. § 1B1.8(a)**; *Perry*, 640 F.3d at 810. This court "interpret[s] contracts between defendants and the Government according to general contractual principles." *Perry*, 640 F.3d at 811.

Loesel contends that the district court used self-incriminating information about meth dealing to determine the drug quantity attributable to him, and thus the guideline range. (The information detailed meth activity in the Northern District of Iowa, where he testified under an immunity agreement inapplicable here.) The proffer agreement states that self-incriminating statements cannot "be used to determine the appropriate guideline sentence." But it lists exceptions, including "to rebut any factual position taken by or on [Loesel's] behalf in connection with sentencing issues or for any other reason."

He asserts the exception does not apply. Not so. At sentencing, he claimed his girlfriend's pseudoephedrine purchases were not attributable to him. According to Loesel, his claim is a "legal theory," not a factual position. Drug quantity is a question of fact. *See Walker*, 688 F.3d at 420. The government used his proffer statements about meth use and distribution to rebut Loesel's factual position about drug quantity — which is permitted under the agreement. *Cf. Perry*, 640 F.3d at 812-

13 (holding the proffer agreement was violated where "information . . . from the proffer session could be used against [the defendant] only if he . . . [materially] contradicted statements made during the proffer session—and . . . only as 'impeachment or rebuttal evidence, or as the basis for a prosecution for perjury or false statement'"). The district court did not err in using that information to determine the guideline range.

\* \* \* \* \* \* \*

The judgment of the district court is affirmed.

_____